# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8561 | **DATE** | 9/30/2004 |
| **CASE TITLE** | Akiyoshi Yonehara vs. American Airlines, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment [Doc. No. 14]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached memorandum and order, Defendant's motion for summary judgment [Doc. No. 14] is DENIED.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| X | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

SEP 3 0 2004
date docketed

15
docketing deputy initials

date mailed notice

**Document Number**

35

slf(lc)
courtroom deputy's initials

U.S. DISTRICT COURT

2004 SEP 30 PM 3: 17

Date/time received in central Clerk's Office

mailing deputy initials

AKIYOSHI YONEHARA,       )
                         )
         Plaintiff,      )
                         )    No. 02 C 8561
v.                       )
                         )    HONORABLE DAVID H. COAR
AMERICAN AIRLINES, INC., )
                         )
         Defendant.      )

DOC....
SEP 3 0 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Akiyoshi Yonehara ("Yonehara" or "Plaintiff") has brought a claim against American Airlines, Inc. ("American" or "Defendant"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 20003 *et seq.*, alleging Defendant discriminated against him based upon his race (Asian), national origin (Japanese), and sex (male). In addition, Yonehara alleges Defendant violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.,* and race discrimination pursuant to 42 U.S.C. § 1981 ("§ 1981") Before this Court is Defendant's motion for summary judgment on all counts of Plaintiffs' complaint. For the reasons set forth below, Defendant's motion for summary judgment is DENIED.

## FACTS[1]

### *A. Yonehara is Hired by American*

Yonehara is an Asian male of Japanese national origin, who was 63 years old at the time his complaint was filed. On November 2, 1998, Yonehara was hired by American as a Pacific

---

[1] Unless otherwise noted, all facts are taken from the Parties' Local Rule 56.1 materials.

-1-

*35*

Sales Specialist, Level 4 Sales Manager, in American's Chicago Passenger Sales office in

Rosemont, Illinois. Thomas Aichele ("Aichele") American's Managing Director of Chicago

Sales, communicated the offer of employment to Yonehara. Aichele felt that Yonehara was a

very personable individual who appeared able to build relationships, had past sales experience,

and an understanding of the Asia-Pacific part of the world, specifically, the Japanese language

and culture. Plaintiff's compensation for his employment with American included an annual

salary of $45,000. In addition, when he was hired by American, Yonehara was given $1,000 for

miscellaneous expenses associated with his relocation to Chicago from New York. At the time

of his hire, Yonehara reported directly to Aichele, who expressed his intent for Yonehara to be

successful with American.[2]  Additionally, Yonehara reported indirectly to Anthony Marra, and

subsequently, Paul Obermueller ("Obermueller")[3]

### B. Yonehara's Job Responsibilities as Pacific Sales Specialist

The Pacific Sales Specialist's job description states that the employee: (1) is responsible

for Japanese ethnic agencies and corporate accounts in the designated area; (2) provides indirect

support for area sales managers to secures commitment for Japan and Asia revenue and market

share; (3) analyzes sales as they relate to Japan and Asia market opportunities for agency and

corporate accounts; (4) develops strategic plans in conjunction with Pacific Regional Sales

Managers and Headquarter Pacific Sales Specialist to capitalize on opportunities; (5) has active

---

[2] Aichele is a 42 year old Caucasian male who was born in the United States.

[3] Paul Obermueller, a 55 year Caucasian male born in the United States, is employed by American as a Manager, Asia Pacific Sales, a position which he has held for at least 8 years. Obermueller is responsible for U.S. point of sale to Asia, including Japan, Hong Kong, China and Thailand. He is also responsible for supporting sales efforts and the sales force in Japan and in the Asia Pacific market.

involvement with key organizations that foster marketing and visibility in the Japanese American business community as well as cultural, charitable and philanthropic organizations which have a strong focus on the Japanese and Asian local population. Other requirements included: (1) previous work experience in international sales and marketing with a thorough understanding of Japanese and other Asian cultures; (2) Japanese language skills (highly preferred); (3) travel; (4) excellent selling, listening, communication and presentation skills; (5) knowledge of RMDS, SABRE, IRIS, PADRE and PC skills (highly desirable); (6) a degree or equivalent experience.

A significant portion of Yonehara's responsibilities as the Chicago Pacific Sales Specialist included marketing the Chicago/Tokyo flight to ethnic Japanese travel agencies and corporate accounts. In addition, Yonehara was expected to be actively involved with organizations that fostered networking with the Japanese business community and to participate in cultural, charitable and philanthropic organizations that focused on the Japanese population in Chicago. All Pacific Sales Specialists were also required to participate in weekly meetings. Further, all Pacific Sales Specialists were required to participate in quarterly meetings and to give a presentation that reviewed the current performance trends in their territories. In addition, as a Chicago Pacific Sales Specialist, Yonehara was initially responsible for promoting the Chicago-Narita flight in a territory that included not only the Chicago area, but the entire Central Division, which required him to travel out of state on a regular basis. None of the other Level 3 or 4 sales managers in Chicago Passenger Sales had responsibilities for the Central Division that necessitated regular out of state travel. Approximately a year and a half into Yonehara's tenure

with American, he complained about his excessive workload.[4]   Plaintiff's supervisors

modified his territory so that his responsibilities were limited to the Chicago, and extensive travel

was no longer required.

In approximately September 1999, Josie Tuzzolino ("Tuzzolino") became a District Sales

Manager for Chicago Passenger Sales.[5]  Tuzzolino began working for American in 1989.  She

had held numerous sales positions with the company, including Passenger Sales Team Leader,

Area Sales Manager and Manager Sales Support.  In October 1999, Yonehara began reporting

directly to Tuzzolino.

### B.  American's Issues With Yonehara's Performance

Defendants cite numerous aspects of Yonehara's performance that it feels were deficient,

and eventually led to his discharge when American engaged in a reduction in force ("RIF") on

September 28, 2001. One of the first evaluation's of Yonehara's job performance after Tuzzolino

became his supervisor occurred in January 21, 2000.  However, because Tuzzolino was only

recently assigned as Yonehara's supervisor, the evaluation was conducted by Aichele.  The

review stated Yonehara's development needs included: (1) understanding details of American's

programs; (2) reporting on local marketplace competition; (3) using available technology; and (4)

developing good communication and relationships with headquarters and the Pacific Sales Team.

---

[4] Approximately eight months after he was hired by American, Yonehara also
complained about his excessive workload.

[5]Tuzzolino is a Caucasian female of Italian parentage, born in the United States, and is
34 years old.

Plaintiff was also told that he needed continued development in his oral communication skills (tone), teamwork, technical skills, quantitative/financial skills, flexibility and leadership.[6]

In September 2000, Yonehara was required to make a Pacific Territory quarterly review presentation. Aichele contends that he needed additional information from Yonehara because some of the items presented were generic, and some issues were not addressed that should have been. In addition, Aichele was not in complete concurrence with Yonehara's answers and explanations to his questions about the September 2000 Pacific Territory quarterly review.

Generally, Plaintiff's supervisors at American believed that Yonehara's performance was substandard. However, American contends that they constantly attempted to train, coach and counsel Yonehara to be successful, but Yonehara was never able to gain the skills to perform his job competently. American contends that part of Yonehara's job was to bridge cultural differences in the marketplace. American states that Yonehara could identify differences, but did not identify solutions to bridge those differences in order to bring business to the company. American also asserts that Yonehara was unable to properly use travel authorization certificate technology, and had to ask others to do that work for him. Defendant also maintains that Yonehara repeatedly had problems communicating with his coworkers, and did not interact with other Pacific Sales Specialist at meetings. In joint sales calls, Obermueller observed that Yonehara was not familiar with American's programs. Obermueller also received information from others that Plaintiff had communication problems. Based on his observations, Obermueller felt that Yonehara's quarterly Pacific Territory presentations were poor and substandard, and he

_____

[6] Yonehara was also allowed to prepare portions of the evaluation as part of a self-evaluation process, wherein Yonehara described his performance as "excellent" or "strong" in almost all categories.

informed Tuzzolino of his dissatisfaction with Yonehara's performance. Defendant also maintains that Yonehara did not have a working knowledge of the data programs, such as SmAArts and DataNet (tools in which Plaintiff could measure performance within an individual account), and he often needed retraining to understand the reports and contracts. Defendants also contend that Yonehara had difficulty getting his agencies to renew or resign programs. American contends that Yonehara could not explain to his accounts why American would require them to improve performance before they would receive a payment or earn money on the program.

### C. Yonehara's 2000 Performance Review

One of the key incidents that American cites in support of its motion for summary judgment is Yonehara's 2000 performance review, and the lack of improvement in Yonenhara's performance, subsequent to that review. Yonehara's 2000 performance review occurred on November 22, 2000. Although Tuzzolino was the person who completed the evaluation, she reviewed in the information with Aichele, and shared the information with Obermueller. Yonehara was ranked "Excellent" in two categories, "Strong" in four categories, "Adequate" in 23 categories, and "Developmental Needs" in nine categories. Tuzzoliono cited developmental needs in the following areas: (1) takes responsibility for work and resources; (2) accounts for the impact of strengths and weaknesses on their work; (2) open and approachable; (3) expresses self clearly when speaking; (4) delivers convincing message; (5) attentively listens to others; (6) collaborates with others to get best results; (7) excels in required job skills and knowledge; and (8) understands how job relates to others.

On the evaluation, the employee was also required to rate their own job performance as part of a "self-evaluation." Yonehara's self-evaluation was very different from Tuzzolino's

evaluation. On his self-evaluation, Yonehara felt that he was "Excellent" in ten categories, "Strong" in 19 categories, "Adequate" in seven categories, "Developmental Needs" in one category and "Not Observed" in 1 category. Yonehara felt that the one area where he had developmental needs was in excelling in the required job skills and knowledge.[7]

Clearly, Yonehara disagreed with Tuzzolino's performance evaluation. Yonehara provided Tuzzolino with a written response to the evaluation. In a memorandum to Tuzzolino dated November 26, 2000, Yonehara specifically disputed and responded to Tuzzolino's negative comments in the performance evaluation, including Tuzzolino's assertions that he did not understand Defendant's programs, failed to identify and forward competitive information, failed to communicate with Pacific Sales peers, failed to understand the objectives of a sales manger, failed to meet deadlines, failed to use resources in other departments, failed to accept departmental goals, processes and procedures, did not communicate effectively, did not perform well at quarterly Pacific Sales meetings and did not understand his job and the available technology. On December 13, 2000, Tuzzolino conducted a follow-up meeting with Plaintiff. Tuzzolino reported the discussion to Aichele. In addition, she prepared a written summary of her response to each issue Yonehara disputed in his performance evaluation. Because Yonehara did not agree with Tuzzolino's assessment of his performance, he did not sign the evaluation.

---

[7] In elaborating further on his need improve his job skills and knowledge, in his review, Yonehara commented that he lacked basic knowledge on sales tools, and that he recently had an orientation training, but that was still not enough. Yonehara felt that once he was familiarized with these tools however, he would be able to apply them efficiently.

### D. American Takes Steps to Improve Yonehara's Performance

After Yonehara's evaluation, American concluded that it needed to take certain steps to help Yonehara focus on his job functions. For example. in order to help him improve his job performance, American contends, Yonehara continued to report to Tuzzolino, even after Melissa Parker ("Parker") replaced Tuzzolino as the Chicago Passenger District Sales Manager in January 2001. On January 8, 2001, Yonehara prepared a written "Commitment," which he submitted to Tuzzolino on January 8, 2001; other employees reporting to Tuzzolino or Parker were not required to submit a Commitment form. Tuzzolino, however, was pleased with Yonehara's written "Comitment" and felt that it showed that Yonehara was serious about his work at American.

In addition, American took certain substantive steps to attempt to help Yonehara improve his performance. American has an internal program called "Peak Performance Through Commitment," which is a step process of advisories to an employee which may culminate in a career decision day, or termination. American contends that Yonehara was not put through the Peak Performance Through Commitment Program because the goal was to assist him in further developing his skills and improve his performance in his industry (Yonehara refutes this contention). Instead, in a follow-up to the 2000 evaluation, Yonehara was required to prepare a formal business plan, in order to enable him to help him focus on his job functions and "help him work smarter." Yonehara was the only employee formerly under Tuzzolino's supervision, that was required to submit a business plan. Yonehara submitted his business plan on March 9, 2001, and on March 19, 2001, also executed a memorandum regarding the business plan and his future performance. In response to the business plan, Tuzzolino sent Yonehara an memo, which stated:

Thank you for providing me the extensive 2001 Business Plan that I've requested. This information supplies me with the very specific steps you plan to take throughout 2001 with each customer base (corporate agency, internal HDQ Pacific Sales). By implementing the steps you've provided and clearly keeping your focus to better understand your job responsibilities, you should be able to move the dial, in your territory performance, in a favorable direction.

Chicago is a very competitive marketplace with many carrier options. When the role of the Pacific Specialist was created in the Central Division, you were provided clear expectations to assist in gaining incremental revenue and share from our biggest customers.

Over the last two years, not only has there been a decrease in AA revenue and share with the majority of your territory, to my knowledge you have not been as visible within your territory creating plans to beat OA carriers as you should be.

It is evident that you've been clearly thinking through the process of how to work more effectively within your territory. By creating a strategic business plan, you should be able to make a significant impact within your account base through sharing numbers and implementing programs with your customers to improve AA share. This will enhance your relationship while showing your value within the marketplace.

Melissa Parker and I will be reviewing this plan with you after 60 days to discuss your progress. At that time I would like you to bring in any specific paperwork that provides us the needed documentation to ensure you are following your plan. I would also expect to see share/revenue numbers for your top accounts on a month over month basis. I realized there will not be a significant shift in share, however, the dial should begin moving in a favorable direction. If after 60 days no progress is made, Melissa and/or will be speaking with you to discuss other interests or opportunities within American Airlines.

Eventually, in March or April 2001, Yonehara began reporting to Parker. On May 31, 2001, Parker reviewed Yonehara's progress. Parker was not pleased with Yonehara's progress under the Business Plan, and did not feel as if he properly executed the steps within the plan.

Parker felt that Yonehara: (1) failed to supply data that met the requirements of his business plan; (2) took no action to improve quantitative performance; (3) did not improve share with his Top 7 agency producers; (4) lacked understanding of his role or the objectives of his job description; (5) ignored prior coaching and counseling on how to use American resources available to him; (6) refused to use the assistance of the Pacific Corporate Specialist to secure new opportunities; (7) did not understand the principles of CCBS [creating competitive business solutions]; (8) struggled with technical skills; (9) failed to use a DataNet report in his top accounts, even though he had been previously trained; (10) contacted a competitor to obtain information that was readily available from American; and (11) could not provide information critical to the success of his market.

Finally, Parker observed Yonehara on a joint sales calls on September 8 and 9, 2001. She noted that during the call, Yonehara had no specific discussion topics or performance reviews for the client. In her view, Yonehara used the joint calls to provide agencies the opportunity to request specific programs that had been previously denied by Obermueller. According to Parker, Yonehara made no response to his customers' requests, remained silent, and waited for Parker to reply. Parker felt that Yonehara had encouraged his accounts to bring up these previously denied requests.

### E. American's 2001 Reduction in Force

Yonehara was terminated on September 28, 2001, in a reduction in force following the tragic events of September 11, 2001. American was directly impacted by September 11, 2001, because two of the four jets involved in the September 11, 2001 terrorists' attacks belonged to

American. In addition, the entire United States air transportation system was shut down for several days following September 11, 2001, and that act immediately cut off all revenues to domestic commercial airlines in the aftermath of the attacks. American contends it suffered tremendous and permanent losses of revenue and passenger traffic since the attacks. American contends that because of the events of September 11, 2001, it was forced to reduce its flight schedule by 20 percent. In addition, American contends, it was forced to reduce its operations and workforce by approximately 20,000 employees across all departments.

As part of this effort, American contends, it concluded that it needed to reduce its management ranks and support staff by 10 percent to meet the needs of its reduced capacity. In anticipation of the immediate reduction, and to give its employees as much notice as possible, American sent a letter to all employees on September 19, 2001. The letter advised all employees that the company anticipated an employment loss of unknown reach and duration to occur in the two-week period following September 24, 2001. The employment loss would be a massive reduction in force scheduled to take place on September 28, 2001. Consequently, American's management had approximately seven days (from September 19 to September 25, 2001) in which to make their layoff decisions in time for final announcement on September 28, 2001.

Managers were asked to rank their employees in their affected work groups by evaluating them with reference to four factors: (1) Performance; (2) Knowledge/Expertise/Technical Skills; (3) Abilities; and (4) Criticality. American contends that once employees in the affected work groups were ranked, the managers were told to select for reduction the lowest-ranked employee in the group until they met their target number.

-11-

Patricia Thornton ("Thornton"), the Managing Director for Passenger Sales Central Division American, was responsible for communicating the information regarding the September 28, 2001 reduction in force to the Central Division, including the proper information and instructions on how to carry out the layoffs. Thornton instructed those who reported directly to her to rank the employees on the basis of the instructions from human resources, and to rank the employees so that if the final target was increased or decreased, the rankings would not have to be redone. Rankings were submitted to Thornton (and simultaneously to Tuzzolino), who had the responsibility of assuring that the Central Division Passenger Sales department met its target. In addition, each Managing Director or Regional Manager in the Central Division prepared a written ranking list. After Thornton received the rankings, she attempted to look at the rankings and workload, and tried to equitably distribute reductions based on workloads and targets. In selecting the employees for layoff, Thornton strictly followed the ranking lists. Aichele communicated his rankings to Tuzzolino, who prepared the ranking list. Yonehara was ranked last among the Level 4 management employees and ranked last in the combined Levels 3 and 4 management employees. The final lists of selected employees for Central Division Passenger Sales was prepared and forwarded to American headquarters.[8] Subsequently, American headquarters advised Thornton that the final list was accepted, and to effect the layoffs indicated

---

[8] The parties dispute whether Tuzzolino had any involvement with the Chicago Passenger Sales Levels 3 and 4 rankings or the selection of any employee for layoff. Defendant contends that Tuzzolino had no involvement, while Plaintiff contends that Tuzzolino made recommendations concerning layoffs with respect to the people who were on the team reporting to her as Marketing Manager at the time of the layoffs. Plaintiff also contends that Tuzzolino influenced the selection of Yonehara for layoff through her communications to other managers and the documentation she created alleging poor performance while she supervised him, including the negative performance evaluation.

on the list. The Chicago Passenger Sales Levels 3 and 4 layoff total matched the company target of ten percent. The employees terminated in that group were Yonehara and Greg Quadrini.

It was Parker, Yonehara's immediate supervisor, who prepared the 2001 Reduction In Force Employee Profile Sheet for Yonehara. Yonehara was graded "Poor," the lowest category, in three of the four performance criteria, including: (1) Performance; (2) Knowledge, Experience, Technical Skills; and (3) Criticality. He was graded "Below Expectations" in Abilities, the fourth criterion. Ultimately, it was Parker who presented Yonehara with a form termination letter on September 28, 2001.

### F. Jennifer Ballard Becomes the Chicago Pacific Sales Specialist

Jennifer Ballard, a 48 year old Asian woman of Taiwanese national origin, was the Chicago Pacific Sales Specialist who eventually replaced Yonehara. Ballard was a Pacific Sales Specialist prior to the September 28, 2001 reduction in force; however, her position in San Francisco was eliminated. Ballard became the Chicago Pacific Sales Specialist on October 18, 2001. American contends that Ballard was relocated to Chicago because she was a strong performer. American contends that it needed to relocate Ballard to the Chicago Pacific Sales Specialist position because it needed to meet the ongoing workload with the remaining workforce.

**PLAINTIFFS' MOTION TO STRIKE PORTIONS OF DEFENDANT'S LOCAL RULE RULE 56.1(3) STATEMENT**

Before the Court can address Defendant's motion for summary judgment, it must address Plaintiff's motion to strike, which appropriately, was not filed as a separate noticed motion, but addressed within his response to American's motion for summary judgment.

## I. Yonehara's Motion to Strike Paragraph 8

Plaintiff believes that this paragraph purports to describe a conversation between Plaintiff's counsel and an unidentified individual at the Equal Employment Opportunity Commission ("EEOC"). Plaintiffs contend that the only support cited to in the record by Defendant are unsigned, handwritten notes contained in the EEOC file, and that the author of the notes is not indicated. Thus, Plaintiff contends, the notes are inadmissible hearsay and cannot constitute competent evidence in support of the assertions of paragraph 8. Defendant believes that these notes show that on August 23, 2003, Yonehara's attorney was informed that the EEOC investigation would issue a finding of no cause for discrimination, and that Yonehara's attorney informed the EEOC investigator that she "would prefer the RIS [right to sue] not come out with anything negative." Defendant contends that these notes are business records of the EEOC, and therefore not hearsay, and should be admissible evidence. Federal Rule of Evidence 803(6), "Records of regularly conducted activity," concerns the admissibility of business records. In relevant part, Rule 803(6) states that the following are not excluded by the hearsay rule, even though the declarant is available as a witness:

> A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from

> information transmitted by, a person with knowledge, if kept in the course of
> regularly conducted business activity, and if it was the regular practice of that
> business activity to make the memorandum, report record or data compilation.

These notes do not appear the type of information kept as part of a regular business record, as they are handwritten, and there is no signature. These factors indicate that there is not the level of trustworthiness Fed. R. Evid. 803(6) dictates is necessary for a document to be considered a business record. Consequently, Yonehara's motion to strike paragraph 8 is granted.

## II. Yonehara's Motion to Strike Paragraphs 34 Through 57

Yonehara contends that these paragraphs of Defendants 56.1(3) Statement rely solely upon a declaration signed by Daniel Procknow ("Procknow"), currently a Field Laborer Principal for American. Yonehara believes that the recounting of the September 11, 2001 tragedy and its general impact upon the airline industry as set forth in paragraphs 34 through 46 is unduly prejudicial and immaterial to the issues in this lawsuit. Secondly, Yonehara contends that in paragraphs 47 through 57, Defendant cites Procknow's declaration as the only authority for a general description of how Defendant carried out its post-September11 reduction-in-force. Yonehara believes that there is no factual basis in Procknow's affidavit for concluding that he had personal knowledge of these reduction-in-force procedures.

In addition, Plaintiff contends, Defendant's attempt to utilize Procknow's declaration for these broad purposes is improper and prejudicial to Plaintiff, as Yonehara contends that Procknow was not identified in Defendant's answers to Plaintiff's interrogatories where Defendant was specifically asked to disclose the identity of persons with knowledge of matters related to the allegations and/or defenses, with particular emphasis on the reduction in force. Yonehara contends that prior to Defendant's summary judgment motion, the only involvement of

Procknow in any issue related to this case known to Plaintiff was a meeting he had with Yonehara on May 21, 2002 to discuss the impact of a negative performance evaluation in Yonehara's file upon his prospects for mobility within the company. Plaintiff contends that none of Defendant's employees in their deposition testimony suggested that Procknow had any involvement in or information concerning the reduction in force.

Defendants refute Plaintiffs' assertions, and contend that this affidavit, of a corporate representative, is not prejudicial and is relevant to the reason for the reduction in force. American also contends (incorrectly) that it need not disclose in discovery a potential corporate affiant. In addition, American contends that Procknow was disclosed in discovery, by the Plaintiff, in his response to an interrogatory. (See Pl. Ex. 13, Interrogatory No. 2, Answer, p. 7). In addition, Defendant notes that Plaintiff does not dispute the reasons for the reduction in force, and as such, this evidence does not prejudice him.

Though the realities of September 11, 2002 are daunting and harsh, unfortunately, they are reality; Plaintiff does not dispute their reality. Nor does Yonehara dispute Defendant's need to engage in a reduction in force subsequent to the events of September 11, 2001. The recounting of these events by the Defendants merely sets the background for its need to reduce its workforce, and as such, does not prejudice Yonehara on his underlying claims. The issue in front of the Court is clear: did Defendant, while conducting its reduction in force, unlawfully discriminate against Plaintiff when choosing him as part of that reduction in force. The tragic events of September 11, 2001 can be recounted without taking the focus away from that issue.

In addition, it is clear that Plaintiff had notice of Procknow's potential use as a witness prior to Defendant's motion for summary judgment. In his response to Defendant's

interrogatories, Plaintiff listed Dan Procknow (Human Resources Manager), as someone who may have knowledge or information pertaining to Plaintiff's employment, and alleged discriminatory treatment and harassment by Defendants. In addition, by stating that he is employed as a Field Labor Principal for American, Procknow establishes an adequate foundation for his testimony on American's reduction in force. Consequently, Plaintiff's motion to strike the aforementioned paragraphs is denied.

### III. Yonehara's Motion to Strike Paragraphs 72 and 108

Yonehara contends that paragraphs 72 and 108 improperly mix argument with fact. Plaintiff states that paragraph 72 is argumentative by stating that the Chicago Sales position did not need to be posted "because it was not a job vacancy." In addition, Yonehara contends that paragraph 108 is improperly argumentative in asserting that "[t]here is no requirement that an employee must sign their performance review before it becomes part of their personnel file."

A look at the record shows that these statements were asserted by American personnel, and therefore cannot be deemed argument of counsel. Plaintiff may refute these statements, and he may (and has) properly countered these statements with his additional facts in opposition to Defendant's motion for summary judgment. Consequently, the Court finds that these paragraphs can properly be construed as supported facts, and not improper argument. As such, Plaintiff's motion to strike the above-mentioned paragraphs is denied.


### IV. Yonehara's Motion to Strike Paragraph 105

Yonehara contends that paragraph 105, which attempts to set forth verbatim Tuzzolino's evaluation of Yonehara, misrepresents the content of that document by omitting the more

favorable self-ratings completed by Yonehara which were part of the document. Furthermore, Yonehara notes, paragraph 105 is nine pages in length, which he contends is contrary to Local Rule 56.1's requirement that a moving party's statement "shall consist of short numbered paragraphs..."

While Defendant could have included Yonehara's self-evaluation in its statement of facts, there was no requirement that it needed to, as American presented this evidence to establish how Tuzzolino, as Yonehara's supervisor, felt he was performing. Further, Yonehara provided the full evaluation to the Court; therefore, the Court had both Tuzzolino's evaluation and Yonehara's self-evaluation at its disposal when evaluating Defendant's motion for summary judgment. In addition, while the Court notes that ordinarily, one fact should not be nine pages in length, and parties should take the necessary steps to organize their facts in a way that is consistent with the local rules, the Court does not see this misstep by Defendant as a reason to strike paragraph 105 from the record. Consequently, the Court will not strike paragraph 105.

## V. Motion to Strike Paragraphs 112 and 113

Yonehara contends that Paragraph 112 misrepresents the contents of Tuzzolino's review, by omitting portions of the document that reflect favorably upon Yonehara. Similarly, Yonehara contends that paragraph 113 takes statements out of their specific context to make them appear to be broader criticisms of Yonehara's performance than they were intended to be in the document from which they were excerpted. As with the discussion of Yonehara's motion to strike paragraph 105, Defendants could have opted (but were not required) to include facts in these paragraphs that could be seen as more favorable to Yonehara. And as stated when discussing those paragraphs, Plaintiff's facts filed in opposition to Defendant's motion for summary

judgment, enables the Court to grasp the full picture of Yonehara's employment at American, and determine whether there are genuine issues of material fact for trial. However, the Court sees no need to strike these paragraphs; therefore, Plaintiff's motion to strike these paragraphs is denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 573 (7th Cir. 2003) (quoting Fed. R. Civ. P. 56(c)).

When evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and makes all reasonable inferences in her favor. See Haywood v. Lucent Technologies, 323 F.3d 524 (7th Cir. 2003). The Court accepts the non-moving party's version of any disputed facts, but only if those facts are supported by relevant, admissible evidence. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996).

The moving party has the burden of demonstrating the absence of genuine issues of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995). If the moving party meets this burden, the non-moving party must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); Celotex, 477 U.S. at 324. To successfully oppose the motion for summary judgment, the non-moving party cannot rest on the pleadings alone but must designate specific

facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there

is a genuine triable issue. <u>Selan v. Kiley</u>, 969 F.2d 560, 564 (7th Cir. 1992).


## ANALYSIS

### I. Legal Standard for Employment Discrimination Claim

As previously noted, Yonehara has filed a Complaint in three counts alleging that his former

employer Defendant American Airlines, Inc. (hereinafter "Defendant") discriminated against him

based upon his national origin, sex, race and age by subjecting him to a continuing pattern of

harassment and disparate treatment terms and conditions of employment, which culminated in

his termination on September 28, 2001. Yonehara brings his national origin, sex and race claims

pursuant to 42 U.S.C. § 2000e *et seq.* (hereinafter referred to as "Title VII").[9] Title VII provides

that:

> It shall be unlawful employment practice for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or to otherwise to discriminate

> against any individual with respect to his compensation, terms, conditions or privileges of

> employment, because of such individual's race, color, religion, sex or national origin; or

> (2) to limit, segregate or classify his employees or applicants for employment in any way

> which would deprive or tend to deprive any individual of employment opportunities or

> otherwise adversely affect his status as an employee, because of such individual's race,

> color religion, sex or national origin.

---

[9] Plaintiff also brings his race discrimination claim pursuant to 42 U.S.C. § 1981.

In addition, the ADEA prohibits discrimination against individuals forty years or older, Taylor v. Canteen Corp., 69 F.3d 773, 778 (7th Cir. 1995) (citing 29 U.S.C. § 631(a)), "with respect to the compensation, terms, conditions or privileges of employment." Taylor, 69 F.3d at 778 (citing 29 U.S.C. § 623(a)). Courts have noted both under Title VII and the ADEA, a plaintiff may prove discrimination with either direct or circumstantial evidence, or the indirect burden-shifting method set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Jackson v. E.J. Brach Corporation, 176 F.3d 971, 982 (7th Cir. 1999). Yonehara does not seek to pursue his claims through the direct method of proof, but rather focuses upon the Mc-Donnell-Douglas burden shifting approach. Jackson, 176 F.3d at 982. Under the burden-shifting framework, a plaintiff must establish a prima facie case by a preponderance of the evidence. Id. (citing Testerman v. EDS Technical Prod. Corp., 98 F.3d 297, 302 (7th Cir. 1996). If the plaintiff establishes a prima facie case, " a rebuttable presumption is created and defendants must come forth with evidence of a legitimate, nondiscriminatory reason for their actions." Jackson, 176 F.3d at 982 (internal citations omitted). Once the defendant meets its burden, the burden shifts back to plaintiff to demonstrate that the reasons proffered by the defendant are actually a pretext for discrimination. Id. (internal citations omitted).

In traditional employment discrimination cases, under the McDonnell- Douglas framework, in order to establish a *prima facie* case of employment discrimination, a plaintiff must establish that: (1) he is a member of a protected class; (2) he reasonably performed to the employer's expectations; (3) he was subject to an adverse employment action; and (4) the position remained open. See Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 693 (7th Cir. 2000). However, the Seventh Circuit has adopted variations of the traditional *prima*

*facie* case, in order "to reflect the reality of the workplace." Id. (Because the employer has

removed the position entirely...it makes little sense to require a plaintiff to meet the fourth prong

of the McDonnell Douglas test, in which the plaintiff must demonstrate that the position

remained open or was filled by someone who was not a member of the protected class." Id.).

In the context of an RIF case, in order to establish a prima facie case of discrimination,

Yonehara must show that: (1) he was in a protected class; (2) he performed his job well enough

to meet his employer's legitimate expectations; (3) despite his performance, he was discharged;

and (4) in Title VII cases, his employer sought a replacement for him, or in the case of an ADEA

claim, the employer treated substantially younger, similarly situated employees more favorably.

Id. (internal citations omitted).

## II. Are Yonehara's Claims Actionable Under Title VII and the ADEA?

In construing his claim, Yonehara alleges that Aichele and Tuzzolino conspired to

discriminate against him beginning in July 2000 and that at some point in May 2001, Parker

joined the conspiracy. (See Yonehara Compl., ¶ 15). Yonehara contends that this disparate

treatment included: (1) unreasonably onerous workloads; (2) constant, unwarranted criticism of

his job performance; and (3) poor performance reviews. First, American contends that these

allegations of disparate treatment cannot be considered "adverse employment actions" for

purposes of Title VII and the ADEA, because Yonehara has not shown a quantitative or

qualitative change in his employment. Second, Defendants note that Title VII and the ADEA

state that a plaintiff must file a charge of discrimination with the EEOC, or equivalent state

agency, within 300 days after the "alleged unlawful employment practice." 42 U.S.C. § 2000e-

5(e)(1); see also Sharp v. United Airlines, Inc., 236 F.3d 368, 372 (7th Cir. 2001) (stating that the

300-day limit begins to run when the defendant has taken the action that injures the plaintiff and when the plaintiff knows that she has been injured). American notes that Yonehara filed his charge of discrimination on November 30, 2001. Therefore, American contends, any claim that arose prior to February 2, 2001 is time-barred. Thus, the Court will address: (1) whether an unreasonably onerous workload, continuous criticisms of work performance and poor performance reviews can be considered "adverse employment actions," and if so, (2) whether these actions are time barred.

### A. "Adverse Employment Actions"

The Seventh Circuit has stated that to be considered "adverse," an employment action must constitute a material, adverse change in employment, including such actions as discipline, demotion, termination, denial of wage or employee benefit increases (or given less opportunities for such increases), had job responsibilities reduced, or was made to perform more arduous tasks. See Haugerud v. Amery Sch. Dist., 259 F.3d 678, 692 (7th Cir. 2002). The Seventh Circuit has also noted that, "mere unhappiness and inconvenience are not actionable..." Haywood v. Lucent Technologies, Inc., 323 F.3d 524, 532 (7th Cir. 2003) (citing Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996). "At a minimum, the employee must be able to show a quantitative or qualitative change in the terms or conditions of employment." Haywood, 323 F.3d at 441 (citing Patt v. Family Health Sys., Inc., 280 F.3d 749, 753 (7th Cir. 2002)). Specifically, the Seventh Circuit has stated that, "negative employment evaluations, without some tangible job consequences such as being put on probation or being threatened with probation, do not constitute an adverse employment action." Smart, 89 F.3d at 442. Consequently, Yonehara's

negative performance evaluations cannot be considered "adverse employment actions" for purposes of his prima facie case. There is no indication that Yonehara received probation, the threat of probation, or a demotion because of his negative evaluations. In fact, Yonehara's supervisors collaborated with him to implement a business plan to improve his performance. In fact, there is no indication that but for the reduction in force, Yonehara would have been terminated. Consequently, his performance reviews are not considered adverse employment actions for purposes of Title VII and the ADEA.

Second, Yonehara contends that he was subjected to more onerous deadlines and subjected to a heavier workload that other Level 3 and 4 Sales Managers. Yonehara contends that on July 24, 2000, Tuzzolino told Plaintiff that in addition to his other responsibilities, he needed to prepare weekly calendar reports, weekly sales call logs and weekly accomplishment reports, and submit all of this information to Tuzzolino. Yonehara contends that in addition to his weekly reports, he was also required to prepare a weekly sales call. Yonehara contends that none of the other employees in the Chicago Passenger Sales Office were required to prepare weekly sales call logs or weekly accomplishment reports. American disputes all of Yonehara's contention except the fact that Yonehara was required to prepare a weekly sales call log, as American felt that this would assist Yonehara in focusing upon his priorities. However, it is undisputed that Yonehara found preparing the daily call log unhelpful, and thought it was time consuming and interfered with and added to, rather than alleviated, his work load. Construing all disputed facts in the light most favorable to Plaintiff, his heavier workload and job requirements could be seen as an adverse employment action, as the qualitative conditions of his employment were affected. Therefore, assuming that Yonehara had a more onerous workload than other

employees in the Chicago office, even after he asked his supervisor to reduce his workload, this can be considered an adverse employment action. Of course, this also assumes that other employees were similarly situated (a fact not established), or that Yonehara's duties became more onerous because of intentional discrimination (also not established).

### B. Is Yonehara's Onerous Workload Claim Timely?

As stated, Defendants contend that any adverse employment action prior to February 2, 2001 should be time-barred. Conversely, Plaintiff contends that to the extent some of his discriminatory treatment began prior to February 2, 2001, or more than 300 days prior to the filing of his EEOC charge, Yonehara contends that these claims are not time-barred, because they are part of a continuing pattern of conduct that extended into the limitations period.

In National Railroad Passenger Corp v. Morgan, 536 U.S. 101 (2002), the Supreme Court clarified the continuing violation doctrine:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the [300 day] time period after the discrete discriminatory act occurred. The existence of past acts and the employer's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background in support of a timely claim.

Morgan, 563 U.S. at 113. Consequently, Yonehara's discrete adverse employment actions prior to February 2, 2001 are time-barred. However, as Morgan dictates, although these adverse employment actions are time-barred as an actionable claim, they may be used as background in

support of Yonehara's claims.  Consequently, they are relevant in analyzing Yonehara's
September 28, 2001 discharge claim.

### III.  Has Yonehara Established a Prima Facie Case of Employment Discrimination?

As stated, in order to establish a prima facie case in the context of an RIF, Yonehara must
show that: (1) he was in a protected class; (2) he performed his job well enough to meet his
employer's legitimate expectations; (3) despite his performance, he was discharged; and (4) in
Title VII cases, his employer sought a replacement for him, or in the case of an ADEA claim, the
employer treated substantially younger, similarly situated employees more favorably.  The
element of contention among the parties is the second element.  As stated, American contends
that prior to the RIF, Yonehara was not meeting its legitimate expectations.  American contends
that Yonehara: (1) failed to adequately perform in at least five of the basic job functions of the
Pacific Sales Specialist; (2) was noted as having significant job performance deficiencies by
Aichele in 1999, by Tuzzolino in January 2000, and by Parker in May 2001; and (3) was the
lowest ranked of Level 3 and Level 4 Managers when ranked the reduction in force.

Yonehara disputes Defendant's contention that he was not performing to its legitimate
expectations.  Rather, Yonehara contends that his supervisors sought to negatively impact his
work environment, and ultimately, terminate his employment based on the fact that he was a 63
year-old Asia male of Japanese national origin.  Therefore, while Yonehara does not dispute the
fact that he received negative performance reviews and evaluations, he disputes the accuracy of
those reviews and evaluations.  Plaintiff also asserts (although Defendant contests this assertion)
that Yonehara's territory generated a significant increase in revenue between August and

-26-

September of 2001. Consequently, Plaintiff contends that he was performing his job to Defendant's expectations, and any assertion that he was not is inaccurate.

Yonehara refutes American's contention that he was not performing to its legitimate expectations. Defendants' however, contend that because much of Yonehara's tetimony that he was performing to its legitimate expectations are self-serving affidavits, his testimony has no merit. The Seventh Circuit has recently stated that the fact that an affidavit is self-serving does not necessarily mean that it lacks any evidentiary value.

> We have stated that generally , "[a]n employee's self-serving statements about his inability. . . are insufficient to contradict an employer's negative assessment of that ability." However, we recently clarified this principle by noting explicitly that it is not the mere self-serving nature of a nonmovant's affidavit that renders such evidence infirm. Rather, it is the absence of personal knowledge or failure to set forth "specific facts as required by Federal Rule 56(c) of the Federal Rules of Civil Procedure that is problematic.

See Williams v. Seniff, 342 F.3d 744, 789 (7th Cir. 2003); see also Reynolds v. Arvinmeritor, Inc., No. 1:02-1039-CV-JDT-TAB, 2003 WL 232207060 at * 7 (N.D. Ill. 2003). Specifically, in citing specific facts to rebut American's claim that he was not performing to its legitimate expectations, Plaintiffs cites to several strong customer relationships, and notes how his customers were impressed with Yonehara, and in particular, his understanding of Japanese culture and business. Although this Court notes that clearly, an employer can decide that an employee does not meet its legitimate expectations, even if that employee has strong customer or client relationships, in Plaintiff's particular job, Pacific Sales Specialist, strong customer relationships appear key to acquiring sales. Consequently, because Plaintiff has provided facts

beyond his self-serving affidavits to refute Defendant's assertion that he was not meeting its legitimate expectations, these affidavits have merit.

Assuming *arguendo*, that Plaintiff did not raise an issue of fact as concerning whether he met American's legitimate expectations, the Seventh Circuit has noted that, "When a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of Mc-Donnell-Douglas merge, allowing the plaintiff to establish that similarly situated employees were treated more favorably." Grayson v. O'Neill, 308 F.3d 808, 817. Plaintiff notes that Linda Pedian, a substantially younger, non-Asian, non-Japanese female, another Level 4 Manager, had substantial performance issues, yet was not selected for termination. It is undisputed that Linda Pedian had the following work issues, in that she: (1) missed deadlines in June 1999; (2) kept a full voice mail system; (3) received one customer complaint a year in 1999, 2000 and 2001. American contends that these issues are nothing more than typical everyday performance issues. In addition, American contends that Pedian would attempt to understand and accept criticism, admit her errors, and thanked her managers for bringing the issue to her attention, and promised to improve. American contends that Yonehara never accepted responsibility for his own performance issues, and instead, said that American failed to understand how to conduct its business in the Japanese market.

In this case, it is clear that Yonehara's supervisors at American did not feel as if Yonehara as performing to the company's legitimate expectations. However, Yonehara has also presented evidence of a non-Asian, non-Japanese, substantially younger woman, who had similar

performance problems while employed with American. While American contends that Pedian's performance problems were not as substantial, and that she worked to resolve her issues, plaintiff has provided sufficient evidence to raise a genuine issue of material fact concerning whether American did indeed treat Yonehara more harshly for perceived workplace difficulties. As an example, American states that Pedian was willing to work through any performance issues and accept responsibility, while Yonehara was not. However, Defendants and Plaintiffs have both referenced Yonehara's stated willingness to devise and execute a Business Plan after his November 2000 performance review. It appears, then, that there is at least one instance of Yonehara actively taking steps to work though his job performance deficiencies. Consequently, because Yonehara has raised a genuine issue of material fact as to whether American applied its legitimate expectations in a disparate manner, Yonehara has established a prima facie case of employment discrimination.

In addition, American contends that Yonehara should not be considered similarly situated to Pedian, because although she was a Level 4 Manager, she was not a Pacific Sales Specialist, and thus, cannot be considered similarly situated to Yonehara. However, it is undisputed that at the relevant time of inquiry, when American had to engage in its reduction in force, all Level 3 and 4 Passenger Sales employees were ranked together. Thus, for purposes of determining the most crucial decision in this case, who would be terminated, all Level 3 or 4 Chicago Passengers sales employees are deemed "similarly situated."

## IV. IS AMERICAN'S LEGITIMATE NONDISCRIMINATORY REASON PRETEXT

Once Yonehara establishes a prima facie case of employment discrimination, American must provide a legitimate, nondiscriminatory reason for its employment decision. As stated, American contends that after the September 11, 2001 attacks, it had to engage in a reduction in force. American contends that because Yonehara was in the bottom ten percent of the Level 3 or 4 employees in his group, he was terminated. Now that American has proffered a legitimate, nondiscriminatory reason for its employment decision, Yonehara must provide evidence that the reason was pretext. In the traditional employment discrimination case, to show pretext, a plaintiff must show that the employer's articulated reason for the adverse employment action: (1) had no basis in fact; (2) did not actually motivate its decision; or (3) was insufficient to motivate its decision. Grayson, 308 F.3d at 820 (citing Velasco v. Illinois Department of Human Services, 246 F.3d 1010, 1017 (7th Cir. 2001)). However, in a RIF case, the pretext standard is altered slightly. The Plaintiff need not prove that the reason proffered by the employer is a lie. Testerman v. EDS-Technical Products Corporation, 98 F.3d 297, 303 (7th Cir. 1996) (citing Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995); see also Adreani v. Colonial Bankshores Corp., 154 F.3d 389, 395 (7th Cir. 1998)). Rather, Yonehara must establish that his age, sex, race and/or national origin, 'tipped the balance' in favor of discharge." Testerman, 98 F.3d at 304 (quoting Umplemby v. Potter & Brumfield, Inc., 69 F.3d 209, 213 (7th Cir. 1995)). Consequently, Yonehara must demonstrate that his age, sex, race and/or national origin, "enters the calculus to such an extent that the employ fires an employee who otherwise would have survived the RIF." Testerman, 98 F.3d at 304.

As an initial matter, the Court notes that, "the federal anti-discrimination laws do not authorize judges to sit as kind of 'super-personnel department' weighing the prudence of employment decisions." Grayson, 308 F.3d at 820 (citing Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1139 (7th Cir. 1997). In addition, this Court notes that in the context of a RIF, particularly after the jolting, tragic events of September 11, 2001, American had to make tough decisions in the face of inevitable layoffs, and it is not this Court's responsibility to engage in an unduly harsh or unfair scrutiny of that process. However, it is also this Court's responsibility to ensure that in the face of American's inevitable layoffs, Yonehara's race, sex, national origin and/or age did not unfairly 'tip the balance' in favor of his discharge. Most crucial to this inquiry American employee Linda Pedian, as it is undisputed that she had employment issues as well. At this stage of the party's proceedings, the Court cannot determine whether those performance issues are sufficiently distinct from Yonehara's performance issues. Consequently even though American has proffered a legitimate, nondiscriminatory reason for Yonehara's discharge, there is a genuine issue of material fact concerning whether American's reasons was pretext, and in fact, it Yonehara's race, sex, national origin, and/or age did not tip balance in favor discharge.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED.

Enter:

David H. Coar
United States District Judge

Dated: **September 30, 2004**